# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

GWENDOLEN DELOPEZ,

           **Plaintiff,**

    **vs.**                                                   Civ. No.  19-735 JCH-KK

BERNALILLO PUBLIC SCHOOLS,
DEMETRIA NAVARRETTE, in her individual
capacity, KEITH COWAN, in his individual
capacity, TAMIE PARGAS, in her individual
capacity, and ERIC JAMES, in her individual
capacity,

           **Defendants.**

## <u>MEMORANDUM OPINION AND ORDER</u>

On November 16, 2020, Defendants Bernalillo Public Schools, Demetria Navarrette, Keith Cowan, Tamie Pargas, and Eric James ("Defendants") filed a *Motion for and Memorandum in Support of Summary Judgment* (ECF No. 56). Defendants previously filed a Motion and Memorandum for Partial Judgment on the Pleadings (ECF No. 18), and in a Memorandum Opinion and Order thereon, this Court reserved ruling on whether to dismiss Counts IV and VIII until it reviewed the evidence submitted in the summary judgment briefs. (*See* Mem. Op. and Order 1-2, 17, ECF No. 72.) As permitted by the Court's order, the parties submitted additional briefs and evidence concerning the issues of exhaustion of administrative remedies for claims brought under the New Mexico Human Rights Act ("NMHRA"). (*See* Defs.' Br., ECF No. 75; Pl.'s Supp. Br., ECF No. 76.) The Court, having considered the motion, briefs, supplemental briefs, evidence, and applicable law, concludes that Defendants' motion for summary judgment should be granted as to all claims and the complaint should be dismissed in its entirety.

## I.     FACTUAL BACKGROUND

The record, viewed in the light most favorable to Plaintiff and drawing all inferences in her favor, shows the following.

Plaintiff had been employed with Defendant Bernalillo Public Schools ("BPS") since 2008. (Defs.' Undisputed Material Fact ("UF") ¶ 1, ECF No. 56.)[1] For the 2017-18 school year, Plaintiff had an employment contract as an art teacher with BPS at Carroll Elementary School ("Carroll"). (*Id.*) Principal Demetria Navarrette ("Navarrette") was Plaintiff's supervisor for her final two years at Carroll. (Defs.' UF ¶ 2.) Plaintiff described her first year working with Navarrette as "okay." (*See* DeLopez Dep. 49:14-23, ECF No. 56-2.) At the end of the 2016-17 school year, Plaintiff made a poster about a parent meeting, which came across as critical of Navarrette's method of communication about the meeting, and since that time, Navarrette began to put words in Plaintiff's mouth "and telling [her] to be quiet, even though [she] didn't say those words." (*See* DeLopez Dep. 50:2-52:4, ECF No. 56-2.)

At the beginning of the 2017-18 school year, Navarrette made a "grimace" face, which was not nice, behind DeLopez's back to Navarrette's secretary, causing her secretary to laugh. (*See id.* at 53:16-56:21.) During an ice breaker activity in a staff training the first or second day of school, Lori Spina ("Spina") excluded DeLopez from the personality group in which DeLopez thought she belonged, and Navarrette thought it was fine. (*See id.* at 54:3-6, 56:10-21; Pl.'s Ex. 3, ECF No. 61-1 at 9 of 36; Pl.'s Ex. 15 at 16:6-7, ECF No. 61-2 at 20 of 38.) In a staff meeting at the beginning of the year, Navarrette also made a snide comment in response to a question from DeLopez, "Well, you have all the money. We don't." (DeLopez Dep. 59:6-16, ECF No. 56-2.)

---

[1] The Court will refer to facts as Undisputed Facts ("UF") for those facts that are undisputed by Plaintiff or which Plaintiff disputed but failed to contradict with admissible evidence.

On or about August 18, 2017, DeLopez left Carroll to go to Bernalillo Elementary School. (*See id.* at 60:18-61:25; Pl.'s Ex. 2, ECF No. 61-1 at 8 of 36.) Because Navarrette was busy with parents, DeLopez told the office staff she was leaving, signed out on a clip board, and signed in and out at the other school. (*See* DeLopez Dep. 60:18-61:25, ECF No. 56-2; Pl.'s Ex. 2, ECF No. 61-1 at 8 of 36.) She assumed Navarrette would let her go to the other school despite DeLopez having bus duty. (Pl.'s Ex. 2, ECF No. 61-1 at 8 of 36.) Navarrette wrote a disciplinary warning for this incident, asserting that DeLopez failed to notify an administrator before she left the school, when DeLopez had been assigned to bus duty Carroll that afternoon. (*See id.*; DeLopez Dep. 60:18-65:13, ECF No. 56-2.) After receiving a warning for leaving early without notifying the administration, DeLopez emailed the Superintendent to request a meeting with him and to complain that she was being bullied. (Defs.' UF ¶ 7, ECF No. 56.) Plaintiff had issues with other first-year principals too, saying that all first-year principals harass her. (*See* DeLopez Dep. 32:24-33:9, ECF No. 56-2.)

On September 7, 2017, DeLopez went to the office and Jennifer Trujillo ("Trujillo"), the union president, and Spina, a union representative, blocked the door to the office. (*See* DeLopez Dep. 74:6-77:13, ECF No. 61-1.) Trujillo was upset because DeLopez emailed the vice-president of the union to get a copy of the collective bargaining agreement ("CBA"), and DeLopez, who was unhappy with union leadership, asked when there would be a vote for the union president. (*See id.*) Navarrette wrote a note regarding the incident, but DeLopez was not otherwise disciplined regarding it. (*See id.*; DeLopez Dep. 78:20-80:19, ECF No. 56-2.) The two union staff members were not disciplined, even though they were being loud. (*See* DeLopez Dep. 74:6-77:13, ECF No. 61-1.)

On December 1, 2017, during DeLopez's duty assignment, she called via a walkie-talkie to second grade teachers, politely telling them to come and pick up their students. (*See* DeLopez Dep. 155:4-17, ECF No. 56-2.) Even though the teachers were two minutes late, Navarrette yelled at DeLopez, "They still have a minute." (*Id.*)

On December 5, 2017, Michelle Padilla ("Padilla"), BPS's director of curriculum and instruction, emailed DeLopez and other art teachers a document that gave a breakdown by school enrollment of the percentages of a Fine Arts Supply Material funds grant that would go to each school. (*See* DeLopez Dep. 84:9-12, 92:1-93:18, ECF No. 56-2; Defs.' Ex. E, ECF No. 56-5.) According to the email, teachers had a deadline of January 31, 2018, to turn in orders. (*See* DeLopez Dep. 93:14-18, ECF No. 56-2; Defs.' Ex. E, ECF No. 56-5.)

On December 15, 2017, Navarrette issued DeLopez a Formal Letter of Reprimand regarding a number of incidents. (*See* DeLopez Dep. 82:13-83:1, ECF No. 56-2; Ex. D, ECF No. 56-4). The first allegation occurred on December 5, 2017, in which DeLopez allegedly spoke to an educational assistant in loud and harsh tones, stating, "I'm talking to you." (DeLopez Dep. 83:2-25, ECF No. 56-2; Ex. D, ECF No. 56-4.) According to the second allegation, DeLopez, without an appointment, walked into a meeting between Navarette and Padilla, and DeLopez demanded information from Padilla in a confrontational tone, even though they had already emailed the information to her. (DeLopez Dep. 84:5-85:10, ECF No. 56-2; Ex. D, ECF No. 56-4.) Third, the letter said that Celia Nielsen from the district office reported on December 6, 2017, that DeLopez was very rude and unprofessional to her on the phone in requesting information. (DeLopez Dep. 85:11-86:5, ECF No. 56-2; Nielsen Dep. 6:15-7:11, ECF No. 61-1 at 24 of 36; Ex. D, ECF No. 56-4.) Finally, on December 11, 2017, a parent called to report that DeLopez peeled a scab off her son's arm during her art class, and the wound continued to bleed. (*See* DeLopez Dep. 86:6-88:6,

ECF No. 56-2; Ex. D, ECF No. 56-4.) The parent was very upset that DeLopez touched her son in this manner (*See* Ex. D, ECF No. 56-4.) The letter of reprimand warned DeLopez that she was not to touch students in any manner, according to state and school board policy, and that if that type of behavior occurs again, it "could lead to further discipline up to and including discharge/termination." (*Id.*; *see also* DeLopez Dep. 88:7-16, ECF No. 56-2.)

DeLopez wrote a rebuttal to the letter of reprimand on December 21, 2017. (Ex. 5, ECF No. 61-1 at 20 of 36.) DeLopez disputed that she spoke to the educational assistant in harsh tones, that she spoke inappropriately to Padilla, and that she was rude and confrontational to Nielsen. (*See* DeLopez Dep. 83:6-13, 84:13-86:5, ECF No. 56-2.) DeLopez asked Padilla questions about the grant they recently received, and because Padilla was interrupting DeLopez, DeLopez asked her a couple of times if she could talk. (*See id.* at 84:13-85:10.) As for the incident with Nielsen, DeLopez said that she had trouble understanding her, so she was a little frustrated, and they started talking at the same time. (*See id.* at 85:11-86:5.) Regarding the scab event, DeLopez admitted that she pulled the scab off a second-grade student, but she thought the boy had glue with glitter sticking off his arm, so she took it off without realizing at the time that it was a scab. (*Id.* at 86:6-88:6.) The wound bled profusely. (*Id.*) DeLopez put on two band-aids and then sent the student to the nurse because it was bleeding so much. (*Id.*)

On or about January 18, 2018, Tamie Pargas ("Pargas"), BPS's Director of Human Resources, added a letter to DeLopez's personnel file, which corrected some errors in the December 15, 2017 letter. (Ex. 4, ECF No. 61-1.) The corrections clarified that four, not three, issues were listed in the letter; gave the correct reference to the Board policy forbidding inappropriate contact with any student; and removed "Corrective Action #1." (*Id.*) The first corrective action referred to treating teachers appropriately, but the allegations involved staff, not

teachers, so Corrective Action #2, requiring professionalism with all district staff, covered the corrective action. (*Compare id.*, *with* Ex. D, ECF No. 56-4.)

On January 29, 2018, DeLopez emailed Padilla and asked for a two-week extension to order art supplies. (DeLopez Dep. 95:13-97:7, ECF No. 56-2; Ex. F, ECF No. 56-6.) Padilla gave her a one-week extension, but DeLopez asked for additional time beyond that because she was very stressed out about the reprimand. (*See* DeLopez Dep. 95:13-97:7, ECF No. 56-2.) DeLopez placed her order on February 11th, but there was an issue with the vendors, so the district had problems with her order. (*Id.* 98:25-100:3.) On February 23, 2018, Padilla emailed DeLopez informing her that she needed to spend the remaining balance of her Fine Arts supply and materials funds by February 27, 2018, or the funds would no longer be available. (*See id.*; Ex. H, ECF No. 56-8.)

On or about February 20 or 23, 2018, DeLopez had a meeting with Pargas because DeLopez wanted to know why she could not make vendors anymore and what the time constraint was. (*See* DeLopez Dep. 107:6-108:6, ECF No. 56-2.) A few days after this meeting, Pargas and Superintendent Cowan came into DeLopez's room to ask her about a rumor that she went to the Public Education Department ("PED") to complain. (*See id.* at 108:7-24; Ex. 3, ECF No. 61-1 at 13 of 36.) When DeLopez asked where the rumor came from, Cowan pointed to Pargas. (DeLopez Dep. at 108:7-20, ECF No. 56-2.) DeLopez, however, denied that she called the PED to report anything or complain about anything, because she had not. (*See id.* at 108:7-24, 111:10-17.)

On or about March 23, 2018, DeLopez met with Navarrette to discuss her evaluation. (*Id.* at 113:25-114:4.) DeLopez was going to rebut her evaluation, but Navarrette had misinformed her that she could not do that anymore. (*Id.* at 117:16-23.) DeLopez later learned that within ten days of her evaluation review, she could have made a written rebuttal concerning the grades on her

evaluation. (*See id.*; Ex. 8 & 9, ECF No. 61-1 at 32-34 of 36.) Under the CBA, an employee has 20 days to submit a grievance after the incident occurred. (*See* Ex. J, ECF No. 56-10.) Employees may submit a written rebuttal in disagreement with their performance evaluations, and the rebuttal will be made part of the evaluation. (*See* Ex. 9, ECF No. 61-1 at 34 of 36.)

On April 16, 2018, Delopez received a signed "Appointment Memorandum" from Superintendent Cowan that stated: "This is official confirmation that I have approved your appointment with the Bernalillo Public Schools for the 2018-2019 contract year….Return a signed copy of this memorandum to the office of Human Resources indicating your acceptance or rejection of employment within ten (10) days from receipt." (Ex. 18, ECF No. 61-2 at 34 of 38.) On April 25, 2018, DeLopez signed the "Appointment Memorandum" accepting the appointment for the 2018-19 contract year. (*Id.*)

On April 27, 2018, DeLopez, having previously had two years of highly qualified certification, filed a grievance through her union because of her lower grades. (*See* DeLopez Dep. 112:8-113:15, ECF No. 56-2; Ex. 10, ECF No. 61-1 at 35 of 36.) She complained that she experienced a pattern of unprofessional behavior by Navarrette and the HR Director, including an angry outburst by Navarrette. (*See* Ex. 10, ECF No. 61-1 at 35 of 36.) DeLopez also asserted that her last evaluation was biased against her due to allegations against her of using an unprofessional tone and an untrue rumor that she complained to the State about BPS. (*See id.*) DeLopez also contended that Navarrette based her observation evaluation strictly on literacy standards that are not appropriate for an art class, and that she had not been provided professional development and in-service training programs. (*See id.*)

On May 1, 2018, DeLopez met with Navarrette, Eric James ("James"), and Beverly Rankin, a union representative at Carroll, concerning her grievance, as the provisions for a

complaint and grievance are similar (*See* DeLopez Dep. 112:21-118:19, ECF No. 56-2; James Dep. 11:4-16, ECF No. 56-11.) James agreed that they should provide her more professional development opportunities. (*See* DeLopez Dep. 115:15-116:5, ECF No. 56-2.) He also informed her that her concerns regarding the evaluation were outside of the CBA and not subject to the grievance process. (*Id.* at 116:15-19.)

On May 7, 2018, an autistic boy in one of DeLopez's first-grade art classes started dashing under tables erratically and then another student told her that the boy stabbed the student's ankle. (*See* DeLopez Dep. 118:20-121:10, ECF No. 56-2.) She attempted to calm the autistic student down verbally, but could not, and the boy retreated farther under the table. (*Id.* at 120:12-15.) DeLopez called the boy's teacher and told her that he was running around erratically, and that she needed help, but the teacher was leaving the building and said to call Ms. Vasquez, the special education teacher assigned to the student. (*Id.* at 120:16-20.) She then called Justice Vasquez ("Vasquez") and told her the boy was acting crazy, but Vasquez said she could not come because she was testing. (*Id.* at 120:16-124:22; Navarrette Dep. 28:15-16, ECF No. 61-2 at 3 of 38.) DeLopez did not call the main office or use her walkie-talkie. (*See* DeLopez Dep. 125:13-22, ECF No. 56-2.)

DeLopez then saw a female student was sitting behind the boy, embracing him from the back, which had calmed him down. (*Id.* at 120:22-121:8.) DeLopez was concerned that if the student let him go, he would start his erratic behavior again, but she also knew a student is not supposed to restrain another child. (*Id.* at 137:2-23.) So, DeLopez took the boy's legs, and she and the female student carried him out of the classroom to the special education teacher's classroom. (*See id.* at 122:5-124:16.) Vasquez, however, was not testing any students when DeLopez arrived at her classroom. (*See id.* at 124:12-16.) DeLopez returned to the art classroom in about 45 seconds.

(*Id.* at 122:10-14.) She left over twenty students alone in the art classroom during those 45 seconds. (*See id.* at 122:10-124:25.)

DeLopez had not previously received Crisis Intervention Prevention ("CPI") training. *(See id.* at 138:8-25; Navarrette Dep. 26:1-3, ECF No. 61-2 at 3 of 38.) Not every teacher was CPI trained, and the district prioritized who received the training. (*See* Navarette Dep. 26:1-27:27:6.) According to the CPI training, the protocol for dealing with a classroom emergency was to call for assistance, and when the other adult arrived, to take the students in the class outside the classroom and leave them with another teacher, while the student who caused the emergency would stay in the classroom. (*See id.* at 29:16-31:3.) This information was on the modification/accommodation binders given to each teacher at the beginning of the year. (*See id.*)

The autistic student had an Individualized Education Plan ("IEP") that provided for accommodations for his learning environment, including allowing him to be removed from the group as needed and adaptive modified seating as needed. (*See* DeLopez Dep. 193:21-194:15, ECF No. 56-2; Ex. O, ECF No. 56-15.) Vasquez gave DeLopez a pack of new IEPs, including the autistic student's IEP, but DeLopez did not find the time to read them. (*See* DeLopez Dep. 193:21-194:15, ECF No. 56-2; Ex. O, ECF No. 56-15.)

On May 8, 2018, James placed DeLopez on administrative leave for the May 7, 2018 incident. (*See* DeLopez Dep. 130:3-22, ECF No. 56-2; Ex. P, ECF No. 56-16.) On May 10, 2018, Navarrette delivered to DeLopez a letter, stating that for the 2018-19 school year, she would work with DeLopez on including time for her to attend a monthly professional training; including time for her to attend District Professional Development; and implementing observations and continuous post conferences regarding all teacher evaluation domains. (Ex. 11, ECF No. 61-2 at 1

of 38.) Navarrette believed that the letter resolved DeLopez's grievance. (*See* Navarette Dep. 107:16-23, ECF No. 61-2 at 5 of 38.)

That same day, at 10:00 a.m., a predetermination due process meeting was held during which Plaintiff had the opportunity to explain the incident surrounding the removal of the student from her class. (Defs.' UF ¶ 30, ECF No. 56.) A second meeting occurred later that same afternoon with DeLopez, Navarrette, Spina, Olivia Perez, and James in attendance. (*See* DeLopez Dep. 131:2-134:21, ECF No. 56-2; Ex. R at 29:2-16, ECF No. 56-18.) At the meeting, Navarrette presented DeLopez with a Letter of Reprimand for forcefully restraining the student and informed her she would be on paid administrative leave until further notice. (*See* DeLopez Dep. 134:16-135:19, ECF No. 56-2; Defs.' Ex. Q, ECF No. 56-17; Pl.'s Ex. 15 at 2:20-6:13, ECF No. 61-2 at 17 of 38.) As grounds supporting the May 10, 2018 letter of reprimand, Navarrette asserted that DeLopez's actions in restraining the student violated "NM Statute 32A-6A-10(A) which prohibits restraints and also HB 75," and that her leaving her class violated "Bernalillo Board Policy J-6450 Supervision of Students." (*See* Ex. Q, ECF No. 56-17.) Navarrette informed her she could not be on District property. (*See id.*; Ex. 15 at 6:8-13, ECF No. 61-2.) James explained to DeLopez that her actions were outside the law by restraining the boy after he had deescalated. (*See* Ex. 15 at 8:7-13:2, ECF No. 61-2.)

James told DeLopez she was not being discharged, which meant immediate termination, because they would let her finish out her contract on paid administrative leave, but they would not renew her contract for the following year. (*See id.* 11:16-13:5.) James then explained that, if she instead chose to resign, then this latter incident would not be in her record, and if asked, the District would say DeLopez left on her own terms and it was a non-renewal of the contract. (*See id.* at 12:19-13:12.) James told her she could reapply for other positions in the District. (*Id.* at 29:1-30:9.)

James explained that if she resigned, the District would take no action on her license, and when she went to renew it, she could say she voluntarily resigned, and that she would be paid through the summer because the resignation would be effective the last day of her contract. (*See id.* at 14:18-15:3, 20:9-18.) James told her that they had the option to discharge her immediately and that their case was sound. (*See id.* at 12:19-13:12, 26:3-5, 29:1-16.) He said that he may have trouble getting the superintendent to sign a verification form if the letter went into effect with the non-renewal, but resignation was a way so "this can be saved, so that it doesn't ruin your career or create serious problems for you down the line or with your licensure." (*Id.* at 19:10-20:18.) He expressed his hope that she would "see the mercy in this letter saying you can still reapply for other positions with the District." (*Id.* at 29:4-6.) James explained to her his belief that justice would say to fire her and file a complaint with the PED and go after her license. (*See id.* at 30:15-19.) Perez also discussed her two options: immediate firing or resign with full pay until the end of the year with the opportunity to renew her license and without the May 7, 2018 incident going into her file. (*See id.* at 31:21-32:15, 39:8-41:4, 48:5-50:1.)

DeLopez asked for time to think about her options, but James told her the offer was gone when the meeting was over, and Perez confirmed she had to decide that day. (*Id.* at 39:8-41:4.) Perez said, "If you don't resign[,] they're going to fire you. You don't have a choice." (*Id.* at 40:2-3.) Afterwards, DeLopez said she could not think or read straight anymore and did not know if she could trust them, and Perez and Spina responded that she could reapply to art openings in the District. (*See id.* at 43:14-44:13.) When DeLopez expressed that she felt pressured, James responded that if she felt pressure, not to do anything, and that he would deliver the letter to her. (*See id.* at 48:5-49:15.) Perez added that would mean, "You're terminated." (*Id.* at 49:16.) James indicated he was trying to help her out by giving her the option to resign so it would not be on her

record. (*See id.* at 49:18-50:1.) DeLopez signed a resignation letter, but added the phrase, "Under

pressure." (*Id.* at 53:19-22.) James said he could not accept that and would serve the notification,

but DeLopez responded, "No, let's do the resignation." (*Id.* at 53:19-54:10.) DeLopez signed a

resignation letter, and James said that the official Letter of Reprimand and the consequences would

not go into effect because she resigned, but that the official record of the meeting would exist. (*See*

*id.* at 54:10-56:14.)

Her signed resignation letter stated: "I, Gwendolyn DeLopez, hereby resign from Bernalillo

Public Schools effective June 30, 2018. – End of my 2017-2018 contract." (Ex. S, ECF No. 56-

19.) Since she resigned, she was paid from the day she resigned until the end of her employment

contract. (Defs.' UF ¶ 36, ECF No. 56.)

Following DeLopez's resignation, Pargas and Superintendent Cowan, after learning that

no one had reported the incident to PED, decided to report the incident to the PED Ethics Division

based on their understanding of the state statute, N.M.S.A. § 22-10A-5F and G. (*See* Pargas Dep.

18:1-13, ECF No. 56-9; *id.* at 47:1-22, ECF No. 61-1 at 28 of 36.)[2] On June 18, 2018, Pargas

presented a Licensure Complaint Form to PED on behalf of BPS that relied on a violation of N.M.

---

[2] Plaintiff asserts that Pargas and Cowan were mistaken in their beliefs that they had a duty to report her to PED. The statute in effect at that time provided that a superintendent shall report to the department "any known conviction of a felony or misdemeanor involving moral turpitude of a licensed school employee that results in any type of action against the licensed school employee." N.M. Stat. Ann. § 22-10A-5(E) (1978, as amended in 2007) (subsequent amendments moved the contents of this subsection to subsection (G)). Subsection (F) provided that the superintendent must "investigate all allegations of ethical misconduct about any licensed school employee who resigns, is being discharged or terminated or otherwise leaves employment after an allegation has been made." *Id.* § 22-10A-5(F) (1978, as amended in 2007); 2007 New Mexico Laws Ch. 263 (S.B. 210). If the investigation resulted in a finding of ethical misconduct by the school employee, the superintendent had to report the identity of the licensed school employee and attendant circumstances of the ethical misconduct on a standardized form to the department and the licensed school employee within thirty days following the separation from employment. *Id.* The statute further provided that no agreement between a departing employee and the superintendent could eliminate the responsibility of investigating and reporting the alleged ethical misconduct to the department and any such agreement to the contrary was void. *Id.* In 2018, the statute defined "ethical misconduct" as "unacceptable behavior or conduct engaged in by a licensed school employee *and* includes inappropriate touching, sexual harassment, discrimination and behavior intended to induce a child into engaging in illegal, immoral or other prohibited behavior." *Id.* § 22-10A-5(A) (1978, as amended in 2007) (emphasis added). Consequently, at the time, the statute defined "ethical misconduct" to include more than inappropriate touching or sexual behavior – it broadly covered "unacceptable behavior or conduct." *See id.*

Stat. Ann. § 32A-6A-10 (1978),[3] HB 75, which generally prohibits the use of restraints, and BPS

Board Policy J-6450, which provides that students should not be left unattended without making

a reasonable effort to obtain a school employee to supervise them. (*See* Ex. T, ECF No. 56-20; Ex.

13 & 14, ECF No. 61-2 at 6-9 of 38.)[4] The allegations set forth in the complaint to PED were those

for the May 7, 2018 incident, but it noted the prior letter of reprimand alleging four different

concerns, including the incident in which she pulled off a student's scab. (*See* Ex. T, ECF No. 56-

20.) The Licensure Complaint Form filled out by Pargas expressly states on the form to fill it out

for "NMAC 6.60.9.9(B)&(C) & 6.68.3.8(B) only." (Ex. 13, ECF No. 61-2 at 6 of 38.)[5] Following

an investigation, PED did not prosecute or take action against DeLopez's license as a result of the

complaint. (*See* Ex. 14, ECF No. 61-2 at 9-15 of 38.)

At the time, 37 of 52 staff members at Carroll were over 40 years old and the average age

of staff members working at Carroll was 46 years of age. (Aff. of Eric W. James ¶ 19, ECF No.

56-21.)[6] The art teacher hired to replace DeLopez was 29 years old at the time of hire. (Pl.'s UF ¶

---

[3] Section 6a of Chapter 32A is the "Children's Mental Health and Developmental Disabilities Act." N.M. Stat. Ann. § 32A-6A-1 (1978). The purpose of the Act is to, among other things, "provide children with access to appropriate assessments, services and treatment" and "to a continuum of services to address their habilitation and treatment needs." *Id.* § 32A-6A-2(A) & (B). The term "habilitation" in the Act "includes programs of formal, structured *education* and treatment and rehabilitation services." *Id.* § 32A-6A-4(K) (emphasis added). Section 32A-6A-10(A) provides: "When providing any treatment or habilitation, physical restraint and seclusion shall not be used unless an emergency situation arises in which it is necessary to protect a child or another from imminent, serious physical harm or unless another less intrusive, nonphysical intervention has failed or been determined ineffective." *Id.* § 32A-6A-10(A).

[4] Plaintiff disputes that the statute required Pargas to file a complaint against DeLopez under these circumstances. Notably, the reporting statute in effect at the time was required written to include "unacceptable behavior or conduct." N.M. Stat. Ann. § 22-10A-5(A) (1978, as amended in 2007) (emphasis added*). See also* 2007 New Mexico Laws Ch. 263 (S.B. 210). Plaintiff has thus not demonstrated that Pargas's understanding of the statute was incorrect or unreasonable.

[5] Plaintiff asserts that these code provisions are directed towards sexually inappropriate touching. While that type of misconduct falls within the scope of NMAC 6.60.9.9(B)&(C), the provisions are much broader and encompass a wide range of employee conduct. For example, NMAC 6.60.9.9(C)(23)(a) prohibits unprofessional conduct to include "restraining a student for no valid reason." NMAC 6.68.3.8(B) lists numerous grounds for disciplinary action against a license, to broadly include "a willful violation of any department regulation prescribing standards of conduct for licensed school personnel at a time when the licensee was subject to such requirement." NMAC 6.68.3.8(B)(4). Because of the broad language of the administrative code provisions, the Court disagrees with Plaintiff that Defendants had no legal or factual basis to believe that filing a complaint with PED was appropriate under the circumstances.

[6] Plaintiff argues that Defendants failed to provide evidence that verifies that James' statement regarding ages is accurate and supported. (*See* Pl.'s Resp. 16, ECF No. 61.) James, however, is the Director of Human Resources for

5, ECF No. 61.) DeLopez was 55 years old at the time her employment with BPS ended. (*Id.*) Spina admitted that students have to be picked up at times. (Ex. 20 at 12:21-13:3, ECF No. 61-2 at 38 of 38.) Spina, however, had been CPI-trained to learn how and when to restrain a child, although on May 10, 2018, her training had lapsed. (*See* Spina Dep. 16:7-19, ECF No. 69-5.)

On June 19, 2018, Delopez filed a charge with the Equal Employment Opportunity Commission ("EEOC") alleging that she was forced to resign her employment with BPS because of national origin and age discrimination and retaliation. (*See* Charge of Discrimination, ECF No. 75-2.) On May 8, 2019, the EEOC issued its Notice of Right to Sue. (*See* Notice, ECF No. 75-4.) DeLopez filed this lawsuit on August 12, 2019. (Compl., ECF No. 1). Plaintiff did not receive an Order of Non-Determination from the New Mexico Human Rights Bureau until December 5, 2019. (Defs.' Ex. G, ECF No. 75-7.)

DeLopez asserts numerous claims in her complaint: Count I - Age Discrimination in violation of the Age Discrimination in Employment Act ("ADEA"), Count II - Retaliation in violation of the ADEA, Count III - Hostile Work Environment in violation of the ADEA, Count IV - Age Discrimination in violation the New Mexico Human Rights Act ("NMHRA"), Count V - Retaliation in violation of the NMHRA, Count VI - Hostile Work Environment in violation of the NMHRA, Count VII - Constructive Discharge in violation of the ADEA, Count VIII - Constructive Discharge in violation of the NMHRA, Count IX - Violations of the New Mexico Whistleblower Protection Act ("NMWPA"), and Count X - Breach of Express Contract. (*See id.* at 9-20.) Defendants move for summary judgment on all Plaintiff's claims.

## II.    STANDARD

---

BPS. The Court finds no reason to disregard this factual assertion in James' affidavit concerning ages of employees, which Plaintiff failed to refute with contrary evidence.

On a motion for summary judgment, the moving party initially bears the burden of showing that no genuine issue of material fact exists. *Shapolia v. Los Alamos Nat'l Lab.*, 992 F.2d 1033, 1036 (10th Cir. 1993). Once the moving party meets its burden, the nonmoving party must show that genuine issues remain for trial. *Id.* The nonmoving party must go beyond the pleadings and by its own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). A court must construe all facts and reasonable inferences in the light most favorable to the nonmoving party. *Quaker State Minit-Lube, Inc. v. Fireman's Fund Ins. Co.*, 52 F.3d 1522, 1527 (10th Cir. 1995).  Only disputes of facts that might affect the outcome of the case will properly preclude the entry of summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). There is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. *See id.* at 248.

## III.   LEGAL ANALYSIS

### A.   Age Discrimination under the ADEA (Count I) and NMHRA (Count IV)

Under the ADEA it is illegal for an employer to discharge or otherwise discriminate against any individual who is at least 40 years of age "because of such individual's age." 29 U.S.C. § 623(a)(1) and § 631(a). The Supreme Court interpreted "because of" to mean that age must be "the 'reason' that the employer decided to act." *Gross v. FBL Financial Services, Inc.*, 557 U.S. 167, 176 (2009). An employee claiming disparate treatment under the ADEA may survive summary judgment by providing circumstantial rather than direct evidence of discrimination as set forth in *McDonnell Douglas*. *See Jones v. Oklahoma City Public Schools*, 617 F.3d 1273, 1278 (10th Cir. 2010) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973)).

The NMHRA makes it unlawful for an employer "to discharge … or to discriminate in matters of compensation, terms, conditions or privileges of employment against any person otherwise qualified because of … age." N.M. Stat. Ann. § 28-1-7(A). New Mexico courts frequently look to federal law for guidance when analyzing NMHRA claims. *See*, *e.g.*, *Ulibarri v. State of New Mexico Corrections Academy*, 2006-NMSC-009, ¶ 11, 131 P.3d 43; *Smith v. FDC Corp.*, 109 N.M. 514, 517-18, 787 P.2d 433, 436-37 (N.M. 1990) (following guidance of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), when examining race and age discrimination claims under NMHRA). New Mexico courts have used the *McDonnell-Douglas* test as a framework to use in analyzing age discrimination claims. *Cates v. Regents of New Mexico Institute of Min. & Technology*, 1998-NMSC-002, ¶¶ 15-16, 124 N.M. 633.

To establish a prima facie case for age discrimination, the plaintiff must prove that she was (1) within the protected class of individuals 40 or older, (2) performing satisfactory work; (3) terminated from employment; and (4) replaced by a younger person. *Adamson v. Multi Cmty. Diversified Servs., Inc.*, 514 F.3d 1136, 1146 (10th Cir. 2008). *See also Cates*, 1998-NMSC-002, ¶¶ 17-18 (setting forth same factors to establish prima facie case of age discrimination under NMHRA). This burden is "not onerous." *Plotke v. White*, 405 F.3d 1092, 1099 (10th Cir. 2005). If a plaintiff establishes a prima facie case, the burden shifts to the employer to show a legitimate non-discriminatory reason for its action. *Id.*; *Cates*, 1998-NMSC-002, ¶ 16. If the defendant meets this burden, summary judgment is warranted unless the employee can show there is a genuine issue of material fact as to whether the employer's proffered reasons for dismissal were pretext for age discrimination. *See Plotke*, 405 F.3d at 1099; *Cates*, 1998-NMSC-002, ¶ 16.

A plaintiff may demonstrate pretext through evidence of weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered reasons that a reasonable jury could

rationally find to be unworthy of credence. *Crowe v. ADT Sec. Services, Inc.*, 649 F.3d 1189, 1196 (10th Cir. 2011). Pretext may also be shown through evidence that the proffered reason is false; that the employer acted contrary to a policy or practice when making the adverse employment decision; or that plaintiff was treated differently from similarly situated employees. *Kendrick v. Penske Transp. Services, Inc.*, 220 F.3d 1220, 1230 (10th Cir. 2000). The court does "not ask whether the employer's reasons were wise, fair or correct; the relevant inquiry is whether the employer honestly believed its reasons and acted in good faith upon them." *Riggs v. AirTran Airways, Inc.*, 497 F.3d 1108, 1118-19 (10th Cir. 2007). Although the court must construe all facts favorably to the plaintiff, in evaluating pretext arguments, the court must consider the facts as they appeared to decision-makers. *Bennett v. Windstream Communications, Inc.*, 792 F.3d 1261, 1268 (10th Cir. 2015). To survive summary judgment, the plaintiff must come forward with evidence that would persuade a reasonable jury that the defendant's proffered reason was merely pretext for age discrimination. *See Turner v. Public Serv. Co. of Colorado*, 563 F.3d 1136, 1143–44 (10th Cir. 2009). "Consequently, once a plaintiff presents evidence sufficient to create a genuine factual dispute regarding the veracity of a defendant's nondiscriminatory reason, we presume the jury could infer that the employer acted for a discriminatory reason and must deny summary judgment." *Jones v. Oklahoma City Public Schools*, 617 F.3d 1273, 1280 (10th Cir. 2010) (internal quotation omitted).

In this case, there is no direct evidence of age discrimination, so the Court will use the *McDonnell-Douglas* framework. Defendants argue that Plaintiff cannot satisfy the second and third requirements to establish a prima facie case of age discrimination. As for the second element, Defendants argue that she was not performing satisfactory work based on her unprofessionalism with other staff members and physical touching of two students. With respect to the third element,

Defendants assert that Plaintiff resigned from her position. For purposes of this motion, the Court will assume, without deciding, that Plaintiff was generally qualified for her position and that Defendants constructively terminated her employment.[7] Even assuming Plaintiff established a prima facie case of discrimination, Defendants have shown a legitimate, non-discriminatory reason for constructively terminating Plaintiff's employment, and she failed to demonstrate there is a genuine issue of material fact as to whether Defendants' proffered reasons for dismissal were pretext for age discrimination.

Turning first to Defendants' reasons for the adverse action, Defendants contend that their actions were justified based on Plaintiff speaking rudely to co-workers, improperly leaving school early, peeling the scab off a student, and physically restraining and removing another student from her classroom without need, particularly when the student had an IEP that she never took the time to review. There is evidentiary support in the record for Defendants' proffered reasons, which the Court finds are legitimate, non-discriminatory reasons to support termination of employment. Consequently, the burden shifts to Plaintiff to present evidence sufficient to create a genuine factual dispute regarding the veracity of Defendants' nondiscriminatory reasons.

DeLopez argues the following evidence creates a dispute of fact as to whether the reason for firing her was pretextual. First, she points to the failure of the PED to take action against her license. While PED did not prosecute or take action against DeLopez's license as a result of the complaint, there are no investigative findings in the record or any other evidence pertaining to

---

[7] There is a distinction between "terminate" and "discharge" under the School Personnel Act ("SPA"). The Act defines "discharge" as "the act of severing the employment relationship with a licensed school employee prior to the expiration of the current employment contract." N.M. Stat. § 22-10A-2(A) (1978, as amended in 2007). To "terminate" an employee is to sever the employment relationship with a school employee. *Id.* § 22-10A-2(E). Under the SPA, contract employment has been terminated when the employee's contract is not renewed. *Brooks v. Board of Educ., Farmington Mun. Schools*, 617 F. App'x 887, 889-90 (10th Cir. June 16, 2015). Because Plaintiff was paid through the end of the 2017-18 contract, it appears that constructive "termination" applies here. But regardless of whether Plaintiff was constructively discharged or constructively terminated, the result of the Court's analysis herein is the same.

PED's standards or conclusions for its decision. The Court is not convinced that the lack of action by PED regarding renewing her license creates a genuine dispute of fact as to whether Defendants' reasons for not renewing her contract were lacking in support. Of critical significance here, DeLopez admitted to peeling the scab off a student and for physically restraining and removing an autistic student from her classroom and leaving her students unattended, albeit briefly.

Next, DeLopez contends that the disciplinary actions taken by BPS were letters of reprimands, not discharge actions. The record shows, however, that DeLopez's action in peeling off a student's scab and in her interactions with various BPS employees on three occasions resulted in a letter of reprimand in which she was warned that she was not to touch students in any manner, according to state and school board policy, and that if that type of behavior occurs again, it "could lead to further discipline up to and including discharge/termination." (DeLopez Dep. 88:7-16, ECF No. 56-2; Defs.' Ex. D, ECF No. 56-4.) DeLopez does not dispute that she physically restrained an autistic student in May 2018 after that child had been calmed by another student.

Nevertheless, DeLopez argues that state statutes and HB 75 do not support taking disciplinary action against her. H.B. 75 (codified in N.M. Stat. Ann. § 22-5-4.12), which was in effect on June 16, 2017, provides: "A school may permit the use of restraint or seclusion techniques on any student only if both of the following apply: (1) the student's behavior presents an imminent danger of serious physical harm to the student or others; and (2) less restrictive interventions appear insufficient to mitigate the imminent danger of serious physical harm." N.M. Stat. Ann. § 22-5-4.12(A) (1978, as amended in 2017). *See also* 2017 New Mexico Laws Ch. 33 (H.B. 75). Similarly, Section 32A-6A-10(A) provides: "When providing any treatment or habilitation, physical restraint and seclusion shall not be used unless an emergency situation arises in which it is necessary to protect a child or another from imminent, serious physical harm or unless another

less intrusive, nonphysical intervention has failed or been determined ineffective." N.M. Stat. Ann. § 32A-6A-10(A). Plaintiff argues that § 32A-6A-10 does not reference public schools, and thus, does not serve as a basis for the PED complaint. By its stated terms, however, Section 6A of Chapter 32A applies to structured education programs. N.M. Stat. Ann. § 32A-6A-4(K) (defining "habilitation" to include formal, structured education programs). The Court is thus not convinced that Defendants had no basis for relying on § 32A-6A-10 under the circumstances. Because Plaintiff admitted to physically restraining the student after the female student had calmed him down, Defendants had reason to believe that, at the time of the physical restraint, no emergency was occurring and there was no imminent danger of serious physical harm to the student or others that justified physical restraint and removal by DeLopez.[8] Plaintiff therefore has not created a genuine dispute regarding the veracity of Defendants' stated reason for not renewing Plaintiff's contract based on violations of N.M. Stat. § 22-5-4.12 and N.M. Stat. § 32A-6A-10A.

Plaintiff also asserts that other teachers admitted to the same conduct she engaged in – removing a student physically from the classroom, but without consequence. Plaintiff, however, has not established this fact in the evidentiary record. Spina, DeLopez's representative at the due process hearing, admitted that teachers need to pick up students at times. (*See* Pl.'s Ex. 20 at 12:21-13:3.) There are no specific facts about another incident, however, from which the Court or a jury could determine whether the circumstances were similar enough to compare to Plaintiff's conduct. For example, Spina had been previously CPI-trained to learn how and when to restrain a child, and it is not clear that she ever restrained a child who had already calmed down. (*See* Spina Dep. 16:7-19, ECF No. 69-5.) Furthermore, Plaintiff suggests that the fact that the teachers she contacted for

---

[8] Navarrette's letter also referenced "Bernalillo Board Policy J-6450," but other than the letter itself that sets out the language of the policy, the Court does not have the board policy in the record. Because this Court finds that Defendants had reason to believe Plaintiff violated § 22-5-4.12 and § 32A-6A-10(A), this Court need not analyze this alternative ground.

help with the child were not disciplined for failing to help her, even though they were available, is evidence of pretext. Plaintiff, however, has not established that they violated any rules or policies on May 7, 2018, or that they were otherwise similarly situated to Plaintiff.

Plaintiff argues that Defendants have not shown that the accidental removal of a scab violated any policy, rule, or law. Plaintiff admitted to pulling off the scab of a student, which bled profusely. While she received a warning about touching students as a result of the scab incident, she was dismissed from employment after the May 7, 2018 incident. Plaintiff admitted to touching students in both incidents, one of which caused the student physical harm and the other of which Defendants reasonably believed to violate state statutes. Nothing Plaintiff has submitted casts doubt on the legitimate, non-discriminatory reason for the actions Defendants took when reprimanding Plaintiff.

Plaintiff has submitted no direct evidence of age discrimination, and Defendants had a non-discriminatory reason for not renewing her contract and constructively terminating her employment. This Court does not consider whether Defendants' reasons were wise, fair or correct; instead, it looks at whether the employer honestly believed its reasons and acted in good faith upon them. The record supports that Defendants believed their reasons not to renew Plaintiff's contract and/or constructively terminating her employment, and they acted in good faith upon those reasons. Plaintiff has failed to come forward with evidence that would persuade a reasonable jury that Defendants' proffered reasons were merely pretext for age discrimination. The Court will therefore grant summary judgment for Defendants on Plaintiff's age discrimination claims under the ADEA (Count I) and NMHRA (Count IV).

**B.**  **Hostile Work Environment in violation of the ADEA (Count III) and NMHRA (Count VI)**

"For a hostile environment claim to survive a summary judgment motion, a plaintiff must show that a rational jury could find that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Penry v. Federal Home Loan Bank of Topeka*, 155 F.3d 1257, 1261 (10th Cir. 1998) (internal quotations omitted). *See also Ulibarri*, 2006-NMSC-009, ¶ 12 (explaining that, to establish a NMHRA hostile work environment claim, the plaintiff must show her employer created an environment in which the offensive conduct has the purpose or effect of unreasonably interfering with her work or was intimidating, hostile, or offensive). The environment must be both objectively and subjectively hostile or abusive. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21-22 (1993); *Morris v. City of Colorado Springs*, 666 F.3d 654, 664 (10th Cir. 2012). A court should consider all the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23.

Plaintiff asserts that Navarrette targeted Delopez with snide remarks, inappropriate 'faces,' and false accusations, followed by unjustified disciplinary actions, an unfair performance evaluation, and a circulated rumor that she complained to PED. The combined conduct does not objectively amount to a severe, pervasive hostile work environment. Regarding the disciplinary actions, Plaintiff admitted to pulling a scab off a student, causing the wound to bleed, and to physically restraining an autistic child to remove him from the classroom after he had calmed down. That discipline resulted from these incidents does not show a workplace that was permeated with discriminatory intimidation, ridicule, and insult. No jury examining the evidence in the light most favorable to Plaintiff could conclude she was subject to severe or pervasive harassment.

A plaintiff must also show that the hostile work environment stemmed from age animus. *See Holmes v. Regents of Univ. of Colorado*, 176 F.3d 488, at *7 (10th Cir. May 7, 1999) (unpublished) (explaining that plaintiff alleging hostile work environment under ADEA must show that harassment stemmed from age-related animus); *Smith*, 109 N.M. at 517. There is no evidence in the record of age-based animus or comments. No jury examining the evidence in the light most favorable to Plaintiff could conclude the remarks, faces, accusations, discipline, or tone used with Plaintiff was because of her age. Accordingly, Defendants are entitled to summary judgment on Plaintiff's hostile work environment claims in Counts III and VI.

###### C.      Retaliation in violation of the ADEA (Count II) and NMHRA (Count V)

"The general approach to Title VII suits set out in *McDonnell Douglas* is also applicable to retaliation claims." *Sorensen v. City of Aurora*, 984 F.2d 349, 353 (10th Cir. 1993). "Title VII makes it unlawful to retaliate against an employee *for opposing practices made unlawful by the statute.*" *Hansen v. SkyWest Airlines*, 844 F.3d 914, 924 (10th Cir. 2016) (citing 42 U.S.C. § 2000e-3(a) (italics added). *See also Brown v. Unified Sch. Dist. No. 501*, 459 Fed. Appx. 705, 711 (10th Cir. 2012) ("Title VII's anti-retaliation provision forbids an employer from discriminating against an employee . . . because that individual opposed any practice made unlawful by Title VII or made a charge, testified, assisted, or participated in a Title VII proceeding or investigation.") (quotation marks omitted). A plaintiff may establish a Title VII retaliation claim through either direct evidence that retaliation played a motivating part in the adverse employment decision or through the burden-shifting framework of *McDonnel Douglas*. *Hansen*, 844 F.3d at 925. To make a prima facie case of retaliation, a plaintiff must show: (1) she engaged in protected opposition to discrimination; (2) she subsequently suffered adverse action by the employer; and (3) there was a

causal connection between the protected activity and the materially adverse action. *Id.*; *Sprague v. Thorn Americas, Inc.*, 129 F.3d 1355, 1367 (10th Cir. 1997).

Defendants argue that Plaintiff has not met her burden of producing evidence demonstrating that she engaged in protected activity or that a causal connection existed between her alleged protected activity and any alleged materially adverse action. Turning to the first prong of the prima facie case, when "an employee communicates to her employer a belief that the employer has engaged in a form of employment discrimination, that communication virtually always constitutes the employee's opposition to the activity." *Hansen*, 844 F.3d at 926 (internal quotations omitted). Plaintiff contends she engaged in protected activity when she filed her grievance on April 27, 2018. In that grievance, however, Plaintiff did not oppose any practice made unlawful by Title VII or the NMHRA or make a charge under Title VII or the NMHRA. Instead, in the grievance DeLopez filed with her union, she complained that board policies regarding professional development and training were not followed; she experienced a pattern of unprofessional behavior by Navarrette and Pargas, including an angry outburst by Navarrette; and Navarrette lowered her evaluation scores without sufficient reason and because of standards not appropriate for an art class. Plaintiff, however, did not allege in the grievance that any unprofessional behavior or bias against her was because of her age, or any other protected category under Title VII or the NMHRA. (*See* Pl.'s Ex. 10, ECF No. 61-1 at 35 of 36.) Nor can a reasonable inference be made from her allegations therein that she was opposing an unlawful practice under Title VII or the NMHRA.

Plaintiff also contends that her "supervisory report, complaints to the superintendent, appeals, and written opposition" constitute protected activity. (*See* Pl.'s Resp. 25, ECF No. 61.) Plaintiff, however, has not demonstrated that she complained about age discrimination in violation

of the ADEA or NMHRA such that Defendants would have understood she was engaging in protected activity. Finally, Plaintiff argues that Defendants attacked her teaching license approximately five weeks after her constructive discharge. Defendants, however, submitted the complaint to PED the day *before* Plaintiff filed her EEOC complaint, which alleged age discrimination for the first time. The PED complaint therefore could not have been made in retaliation for Plaintiff complaining of age discrimination. Plaintiff has therefore failed to show evidence of the first and third requirements to establish a prima facie case of retaliation against her under Title VII or the NMHRA. Nor is there any direct evidence of retaliation because of protected activity. Accordingly, Defendants are entitled to summary judgment on Plaintiff's retaliation claims brought under the ADEA (Count II) and the NMHRA (Count V).

### D.    Constructive Discharge in Violation of the ADEA (Count VII) and NMHRA (Count VIII)

Defendants previously moved for judgment on the pleadings on Counts VII and VIII because constructive discharge is not an independent cause of action. In a Memorandum Opinion and Order, this Court ruled:

> Plaintiff expressly invokes the ADEA and NM[H]RA in Counts VII and VIII, respectively, and thus Counts VII and VIII are reasonably construed as asserting ADEA and NMHRA claims based on a constructive discharge theory, not as separate common law retaliatory discharge or due process claims…. While the ADEA and NMHRA constructive discharge claims may be redundant of some of her other claims, the Court will not dismiss them.

Mem. Op. and Order 10, ECF No. 72.

As discussed *supra*, this Court assumed for purposes of this motion that Plaintiff was constructively discharged or constructively terminated, but even so assuming, Plaintiff cannot prevail on her claims because she failed to establish that her discharge/termination was because of age discrimination. For the reasons given above, Defendants are entitled to summary judgment on

Plaintiff's constructive discharge claims brought under the ADEA and NMHRA in Counts VII and VIII.[9]

### E.   Violation of NMWPA (Count IX)

The NMWPA, N.M. Stat. Ann. § 10-16C-1 *et seq*., prohibits a public employer from taking retaliatory action against an employee for communicating to the public employer or a third party about an action or failure to act that the employee in good faith believes is an unlawful or improper act; for providing information to a public body as part of an investigation, hearing, or inquiry about an unlawful or improper act; or for objecting to or refusing to participate in an unlawful or improper act. *See* N.M. Stat. Ann. § 10-16C-3 (1978, 2018 Cummulative Supp.). The NMWPA defines an "unlawful or improper act" as

> a practice, procedure, action or failure to act on the part of a public employer that:
> (1) violates a federal law, a federal regulation, a state law, a state administrative rule or a law of any political subdivision of the state;
> (2) constitutes malfeasance to public office; or
> (3) constitutes gross mismanagement, a waste of funds, an abuse of authority or a substantial and specific danger to the public.

*Id.* at § 10-16C-2(E). "Gross mismanagement" includes a management action or inaction which creates a substantial risk of significant adverse impact upon the public employer's ability to accomplish its mission. *Velasquez v. Regents of Northern New Mexico College*, 2021-NMCA-007, ¶ 36, 484 P.3d 970. The NMWPA defines a retaliatory action as "any discriminatory or adverse employment action against a public employee in the terms and conditions of public employment." N.M. Stat. Ann. § 10-16C-2(D).

The Tenth Circuit has interpreted the federal WPA to require proof of three elements to establish a violation. *See Wells v. Shalala*, 228 F.3d 1137, 1146-47 (10th Cir. 2000). To state a

---

[9] Given this Court's ruling that Defendants are entitled to summary judgment on the merits of Plaintiff's NMHRA claims, this Court need not reach the individual Defendants' additional argument that they are entitled to judgment on these claims because Plaintiff failed to exhaust her administrative remedies before filing suit.

prima facie case under the WPA, a plaintiff must establish that (i) the employee made a protected disclosure; (ii) the employer took an adverse employment action against the employee; and (iii) a causal connection exists between the protected disclosure and the adverse action. *Id.* The NMWPA was modeled after the federal WPA, and thus, cases interpreting the federal WPA have persuasive value. *Wills v. Bd. of Regents of Univ. of N.M.*, 2015-NMCA-105, ¶ 19, 357 P.3d 453. While the federal WPA does not expressly limit whistleblower protection to communications that benefit the public or pertain to matters of public concern, the law protects "whistleblowing," distinguishing between disclosures that benefit "the public by exposing unlawful and improper actions by government employees from communications regarding personal personnel grievances that primarily benefit the individual employee." *Id.*, ¶ 20. The New Mexico Legislature enacted the WPA "to encourage employees to report illegal practices without fear of reprisal by their employers." *Janet v. Marshall*, 2013-NMCA-037, ¶ 21, 296 P.3d 1253 (internal quotation marks and citation omitted).

Plaintiff contends that she engaged in protected activity under the WPA by the following: (i) her complaints to Cowan in August/September 2017 opposing workplace discrimination, harassment, and bullying; (ii) her appeal of the issuance of discipline against her in December 2017/January 2018 with BPS administration; (iii) the April 27, 2018 grievance; (iv) her opposition to BPS's differential treatment of her; and (v) her opposition to Defendants' efforts to suspend or revoke her teaching license. The Court does not find that any of these actions constitute protected activity within the meaning of the NMWPA. Plaintiff's purported protected activities for which she complained related to Defendants' treatment of her. However, as discussed *supra*, prior to her presumed constructive termination, she never alleged that the bias and actions taken against her were violations of federal or state discrimination or other law. It was not until after her employment

ended that Plaintiff communicated her belief that Defendants were violating anti-discrimination laws. Plaintiff's NMWPA claim refers to actions similar to her Title VII and NMHRA discrimination and retaliation claims. But as discussed above, those arguments and supporting facts are insufficient to raise a genuine dispute about whether Defendants failed to renew her contract or constructively terminated Plaintiff for any reason other than the non-retaliatory justifications concerning her physical restraint of a student. She thus cannot show that she complained about activity that violated federal or state law.

Nor did Plaintiff communicate about malfeasance to public office, gross mismanagement, waste of funds, or objections to or refusals to participate in an unlawful or improper act as defined by the NMWPA. Plaintiff's communications amounted to complaints about personnel matters or efforts taken by her to object to personnel actions taken against her, not matters invoking public interest or public concern to which the NMWPA is directed. Because Plaintiff cannot meet the first element of a prima facie case under the NMWPA, the Court will grant summary judgment to Defendants on Plaintiff's claim in Count IX, and it need not address the other elements. *Cf. Lobato v. New Mexico Environment Dept.*, 733 F.3d 1283, 1286, 1297 (10th Cir. 2013) (affirming summary judgment on plaintiff's NMWPA claim where he only invoked arguments and evidence presented for his Title VII claims, but those arguments and supporting facts were insufficient to raise genuine dispute about whether defendant fired plaintiff for any reason other than nonretaliatory justifications provided in dismissal letter); *Wills*, 2015-NMCA-105, ¶¶ 16-21 (holding that plaintiff's filing of complaint communicating to his employer and public that defendants were abusing their authority by withholding his contractually agreed-upon pay was not an activity protected by NMWPA).

**F.      Breach of Contract (Count X)**

Defendants argue that Plaintiff's employment contract is governed by the New Mexico School Personnel Act ("SPA"), and because she resigned, she waived the right to appeal the decision to the school board and the courts. According to Defendants, Plaintiff had the right to request a hearing before the school board to force the District to show just cause, but this did not occur because she resigned, was paid for the duration of her contract, and she did not request a hearing. They further contend that, because she resigned, Defendants did not breach the contract. Moreover, Defendants assert that they would have had cause to terminate her contract because of her inappropriate handling of students.

In response, Plaintiff solely focused on Defendants' just-cause argument. Plaintiff contends that "the 'just cause' for non-renewal required after having executed the enforceable Appointment Memorandum and the contract in place during her 2017-18 contract does not exist under the facts of this case." (Pl.'s Resp. 31, ECF No. 61). Plaintiff states she did not violate a law, rule, regulation, or her contract, and other BPS teachers who acted similarly were not so disciplined.

To prevail on a breach of contract claim, a plaintiff is required to prove a valid contract, breach of the contract, and damages caused by the breach. *See Constr. Contracting & Mgmt., Inc. v. McConnell*, 1991-NMSC-066, ¶ 10, 112 N.M. 371. However, any "attempt by the Board to enter into a contract or promulgate a termination policy giving an employee rights in conflict with the School Personnel Act would be ultra vires and void." *Swinney v. Deming Bd. of Educ.*, 1994-NMSC-039, ¶ 9, 117 N.M. 492.

The SPA sets forth administrative procedures and remedies for an employee to contest a decision to terminate an employee for just cause. *See* N.M. Stat. Ann. §§ 22-10A-24 and 22-10A-25 (1978) (as in effect from April 4, 2003, until June 13, 2019); *Franco v. Carlsbad Municipal*

*Schools*, 2001-NMCA-042, ¶ 10, 28 P.3d 531. In 2018, Section 22-10A-24(C) of the SPA stated, in relevant part, that an employee who

> receives a notice of termination … may request an opportunity to make a statement to the local school board … on the decision to terminate him by submitting a written request to the local superintendent … within five working days from the date written notice of termination is served upon him….

N.M. Stat. Ann. § 22-10A-24(C) (as in effect from April 4, 2003, until June 13, 2019).[10] The local superintendent had to provide written reasons for the notice of termination within five working days from the date the employee requested a meeting and when the local superintendent received the written request for reasons. *Id.* The SPA further provided:

> The employee's request pursuant to Subsection C of this section shall be granted if he responds to the local superintendent's … written reasons as provided in Subsection C of this section by submitting in writing to the local superintendent … a contention that the decision to terminate him was made without just cause. The written contention shall specify the grounds on which it is contended that the decision was without just cause and shall include a statement of the facts that the employee believes support his contention. This written statement shall be submitted within ten working days from the date the employee receives the written reasons from the local superintendent….

*Id.* § 22-10A-24(E) (as in effect from April 4, 2003, until June 13, 2019). The local school board then must meet to hear the employee's statement in no less than five or more than fifteen working days after the local school board receives the statement and notify the parties of its decision within five working days from the end of the meeting. *Id.* § 22-10A-24(F) (as in effect from April 4, 2003, until June 13, 2019). An aggrieved employee may then appeal the decision to an arbitrator, *id.* § 22-10A-25(A), and a de novo hearing must be held, and a decision must be made by the independent arbitrator, *id.* § 22-10A-25(D) (as in effect as of April 4, 2003). The arbitrator's

---

[10] The substance of this provision was formerly codified at N.M. Stat. Ann. § 22-10-14, but the Legislature recompiled § 22-10-14 as § 22-10A-21 to 22-10A-25, effective April 4, 2003. *See* 2003 New Mexico Laws Ch. 153 (H.B. 212), § 72(F) (Recompilation). Further amendments occurred in 2019 and 2021, but those amendments are not relevant here because Plaintiff asserts that she was constructively discharged/terminated in May 2018.

decision is final and non-appealable, except when "the decision was procured by corruption, fraud, deception or collusion, in which case it shall be appealed to the district court…." *Id.* § 22-10A-25(P) (as in effect April 4, 2003).

An employee must exhaust her administrative remedies before a court has jurisdiction to consider an employee's claim that the school board breached its contract. *Cf. Quintana v. State Bd. of Ed.*, 1970-NMCA-074, ¶¶ 2-3, 8, 81 N.M. 671 (holding that, where school district did not re-employ school principal as principal for following year, and where employee appealed decision directly to State Board, neither State Board nor court of appeals had jurisdiction to consider employee's appeal because no hearing was held before local board; mandamus relief is available to employee to test right to hearing before local board if one is not provided). Exhaustion of administrative remedies is required prior to filing suit unless the school district's own actions thwarted the employee's abilities to invoke and exhaust those administrative remedies. *Franco*, 2001-NMCA-042, ¶ 10.

In *Sanchez v. Board of Education of Town of Belen*, the New Mexico Supreme Court considered a case in which the employee sought reinstatement of employment as a teacher, after being convinced by the school board to voluntarily retire, or the board would bring charges against him. 1961-NMSC-081, ¶ 3, 68 N.M. 440. His contract was not renewed, he was recommended to be placed on retirement status, and the board did not serve charges against him. *Id.* Upon learning that he could not be forced to retire, plaintiff advised the board by letter that their action was improper and requested a hearing by the board on the retirement decision. *Id.* The local board held what it termed a "hearing," but did not change its decision as to retirement, and when the plaintiff sought a review by the state board of education, it ultimately upheld the decision of the local board. *Id.* The plaintiff then filed suit to require the board to reinstate him and pay his compensation for

31

the intervening period. *Id.* The board argued that the question was a matter of retirement, not non-renewal or discharge, while the plaintiff insisted that he was discharged. *Id.* ¶ 4.

The *Sanchez* court noted that the problem was confused because the plaintiff changed his mind after the end of the school year, when the statute contemplated notice before the end of the term. *Id.* There was never, however, a formal hearing or request for one as to the actual charges against the plaintiff. *Id.* ¶ 5. The New Mexico Supreme Court agreed with the trial court that the there was substantial evidence showing that plaintiff's "claimed retirement was forced, or involuntary, and that therefore Sanchez was discharged." *Id.* ¶ 5. The *Sanchez* court then looked at whether the remedy of mandamus was available. *Id.* It explained that the statute governing dismissal of tenured teachers provided for a full and complete administrative procedure in the event a tenured teacher was dismissed. *See id.* ¶ 10. The New Mexico Supreme Court, however, stated that the plaintiff failed to follow the statute and filed a writ of mandamus, resulting in the trial court's decision having by-passed the administrative portions of the act and substituting its judgment for that of the board or the state board. *See id.* ¶ 11. It explained that the mandamus remedy was not available to the plaintiff because he could not "seek to enforce a right under the statute and in the same breath fail to utilize the procedures allowed him thereunder." *Id.* ¶ 14. Because the plaintiff failed to exhaust his statutory remedy, he was not entitled to the writ. *Id.*

While Plaintiff here is not seeking a writ, *Sanchez* is instructive in its explanation that the administrative remedies must be followed in situations of constructive discharge or constructive termination. The Court will again assume without deciding that Plaintiff brought forward enough evidence from which a reasonable jury could conclude that she involuntarily resigned, and that her employment was, *de facto*, terminated. The record shows that Defendants provided Plaintiff with a written letter of reprimand on May 10, 2018, stating the grounds for discipline against her, and

she was verbally notified in a meeting that same day that her employment would be terminated if she did not resign. Plaintiff argues that when she resigned on May 10, 2018, she did so under pressure such that it was involuntary and constituted a constructive termination. Assuming that is the case, then Plaintiff had notice as of May 10, 2018, of her constructive termination, so the time for administratively appealing her termination began to run on that date. *Cf. Sanchez*, 1961-NMSC-081, ¶ 12 (concluding that, because the plaintiff's retirement was involuntary, the statute was "sufficiently broad so as so as to be considered as applying as of the date of the original written notice of retirement …, and the status of the parties shall revert to that time as to any further proceedings in the instant controversy").

In her response to Defendants' motion for summary judgment, Plaintiff did not address their arguments that she waived her right to appeal any such termination or discharge by failing to appeal the decision to the school board and then the courts in accordance with Section 22-10A-24 of the SPA. Plaintiff failed to cite evidence in her response to show that she complied with Section 22-10A-24 by submitting a written request for a hearing within five working days of her notice of termination, as required before filing suit to contest a termination. Plaintiff thus failed to satisfy her burden on summary judgment to cite and produce evidence establishing exhaustion of her state statutory remedies to contest whether BPS had just cause not to renew her license.

The Court nevertheless notes that, despite the lack of a citation and argument by Plaintiff, Plaintiff submitted as Exhibit 3 an unsworn timeline by Plaintiff, which contains a statement pertinent to the issue of following administrative procedures necessary to contest a just-cause termination. As relevant here, Exhibit 3 states:

**May 17th 2018** …

Email to Superintendent Request for meeting – no response I want my job back and it is hard to believe that I lost it this way under his watch. He supported me all the way in previous years?

**June 11th 2018**
Send email requesting Exit meeting to Superintendent, I have questions towards my licensure application and my evaluation.

Superintendent responds that HR director will take care of scheduling exit interview.
…

**June 16th 2018**
Exit meeting (5 weeks after forced resignation) …

On licensing application I need to know if "anybody has taken action towards your license" HR director tells me "not as far as I know, no"

Does not want to take any responsibility for evaluation grading by principal which is obviously retaliatory in nature. I question him diligently of when he was not responsible who was and why he did not pass the request to responsible person. Answers are evasive….

(Pl.'s Ex. 3, ECF No. 61-1 at 16-17 of 36.) Because Plaintiff did not cite to or rely on this portion of the record, and Defendants thus did not have an opportunity to respond to the evidence, the Court will not rely on it. Nor is the Court convinced it is admissible evidence and not hearsay. Not only is the timeline unsworn, but the emails themselves are not before the Court. But even if the Court were to consider the evidence, the Court finds that Exhibit 3 does not demonstrate that Plaintiff submitted to Superintendent Cowan within five working days from the date of her constructive termination a request to make a statement to the local school board on the decision to terminate her or otherwise make clear that she wanted to pursue her administrative rights under the SPA. Because Plaintiff has not argued or submitted admissible evidence to create a genuine factual issue about whether she exhausted her administrative remedies under the SPA, or alternatively, how Defendants thwarted her efforts under the SPA such that her suit may go forward, Defendants are entitled to summary judgment on Plaintiff's claims for breach of contract.

*Cf. Martinez v. New Mexico Children Youth & Families Department*, No. CIV 03-0639 MCA/RLP, 2004 WL 7337735, at *9 (D.N.M. July 30, 2004) (granting summary judgment to defendant on plaintiff's breach of contract claim where plaintiff teacher failed to show he complied with SPA by submitting written request for hearing within five working days of service of notice of termination or providing defendants with written contention challenging his termination within required ten-day period).[11]

     **IT IS THEREFORE ORDERED** that Defendants' *Motion for and Memorandum in Support of Summary Judgment* (**ECF No. 56**) is **GRANTED**, and Plaintiff's claims are **DISMISSED WITH PREJUDICE**.

SENIOR UNITED STATES DISTRICT JUDGE

---

[11] Because Defendants are entitled to summary judgment for failure of Plaintiff to have exhausted her administrative remedies prior to suit, the Court need not consider Defendants' alternative argument that they had just cause to terminate her employment as a matter of law.